FILED

2022 Jun-28  AM 09:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **QUANTUM RESEARCH INTERNATIONAL, INC.,** | ) ) ) | |
| **Plaintiff,** | ) ) ) | Civil Action Number |
| **v.** | ) ) | **5:21-cv-01680-AKK** |
| **SPG INSTITUTE, INC., SP GLOBAL, INC., DANIEL TOLLEY, and THOMAS D. BURNS, SR.,** | ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## <u>MEMORANDUM OPINION</u>

This lawsuit alleges a scheme to defraud defense contractors and technology companies, including several based in Alabama, through the "Autonomy Research Network Consortium" or "ARCNet."  Quantum Research International, Inc. sues SPG Institute, Inc., SP Global, Inc., and two executives for apparently leading the operation.  Doc. 23.  The defendants move to dismiss on personal jurisdiction grounds and also argue that Quantum agreed to arbitrate its claims and fails to plead claims for which it is entitled to relief.  *See* doc. 29.  Having considered the briefing, docs. 31; 32, the court will grant the motion, doc. 29, so the parties can submit to mandatory arbitration.

**I.**

Under Rule 12 of the Federal Rules of Civil Procedure, a litigant may move to dismiss the claims against it for lack of personal jurisdiction or for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(2), 12(b)(6). A litigant may also move to dismiss because of a binding arbitration clause. *See Baptist Hosp. of Miami, Inc. v. Medica Healthcare Plans, Inc.*, 376 F. Supp. 3d 1298, 1304 (S.D. Fla. 2019) (citing FED. R. CIV. P. 12(b)(1)).

With respect to personal jurisdiction, the court first considers Alabama's long-arm statute. *See Olivier v. Merritt Dredging Co.*, 979 F.2d 827, 830 (11th Cir. 1992). Interpreting this statute, "the Supreme Court of Alabama has extended the jurisdiction of Alabama courts to the extent permissible under the due process clause of the Fourteenth Amendment." *Id.* The relevant inquiry is thus whether the exercise of personal jurisdiction would violate the Fourteenth Amendment. *See id.* This, in turn, requires consideration of whether the defendants "engaged in minimum contacts with the State of Alabama" and whether "the exercise of personal jurisdiction over the defendants would offend 'traditional notions of fair play and substantial justice.'" *Id.* at 830–31; *see Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). *See also Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162, 1166 (11th Cir. 2005).

Under Rule 12(b)(6), a complaint fails to state a claim if it does not plead

factual allegations that, taken as true, "raise a right to relief above the speculative level" and render it "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. In other words, the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[1]  *Id.*

Finally, if a valid arbitration agreement exists, a court may compel arbitration by dismissing the case in lieu of issuing a stay when all of the issues raised must proceed to arbitration. *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992); *Baptist Hosp. of Miami, Inc.*, 376 F. Supp. 3d at 1304; *Caley v. Gulfstream Aerospace Corp.*, 333 F. Supp. 2d 1367, 1379 (N.D. Ga. 2004) (granting motions to compel arbitration and to dismiss), *aff'd*, 428 F.3d 1359, 1379 (11th Cir. 2005).

## II.

SPGI, a Virginia-based nonprofit, acts as a "conduit" between the U.S. Air Force Research Laboratory—the Department of Defense's research arm—and sub-

---

[1] Relevant to certain of Quantum's claims, Rule 9(b) also requires a complaint to "state with particularity" claims involving fraud.  *See* FED. R. CIV. P. 9(b).  *See also Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007).  However, because the court will not reach the factual sufficiency of Quantum's claims in this opinion, the court does not restate the extent of the standards for pleading fraud under Rule 9.

awardees that work on federal contracts.  *See* doc. 23 at 3–4.  In this role, SPGI

distributes funds from AFRL and must "adequately safeguard all assets and assure

that they are used solely for authorized purposes." *See id.*

In February 2019, AFRL allegedly awarded to SPGI a contract identified as

Cooperative Agreement No. FA8650-19-2-6983.  *Id.* at 3.  Soon after, Daniel Tolley,

a Virginia citizen who serves as SP Global's president and SPGI's treasurer,

"established a 'consortium' called the Autonomy Research Network Consortium

('ARCNet')."  *Id.* at 4–5.  Tolley "represented to the public that businesses could

join [ARCNet] for a fee and then be eligible to bid on projects under the Cooperative

Agreement." *Id.*

SPGI, SP Global, Tolley, and Thomas D. Burns, Sr.—a Virginia citizen who

serves as CEO of SP Global, chairman of its board, and SPGI's president—allegedly

controlled ARCNet.  *Id.* at 5.  They began to recruit "several Alabama businesses"

to join ARCNet and "used [the businesses'] names for promotional efforts."  *Id.* at

5.  Quantum, among other Huntsville-based companies, bought a "membership

interest" in ARCNet, and ARCNet vowed that it and SPGI would "actively solicit

opportunities for members, 'administer and manage the funds collected through the

consortium[,]' and '[b]e responsible for the management and integration of all [the]

[c]onsortium's efforts under the Cooperative Agreement or associated legal

mechanisms.'"  *Id.* (quoting doc. 23-2).  ARCNet purportedly promised Quantum

4

"access to AFRL opportunities under the Cooperative Agreement," and Quantum joined ARCNet "with the expectation of realizing profits in the future." *Id.*

Midway into 2020, things appeared to go as envisioned. In September 2020, "one or more" of the defendants "communicated to Quantum in Alabama about a request for proposal and the possibility of Quantum performing work under a subaward." *Id.* at 6. To this end, the defendants provided Quantum with certain materials, including a proposal form; Quantum submitted its proposal; and the defendants relayed it to AFRL. *Id.* On October 1, 2020, SPGI entered into a "cost reimbursement Subaward Agreement 2020-ARC-S-20013 . . . with Quantum for collecting, securing[,] and monitoring autonomous and artificial intelligence." *Id.* From its location in Huntsville, Quantum performed tasks under the Subaward Agreement for several months and sent invoices to SPGI for this work. *Id.*

But, unbeknownst to Quantum, things had begun to unravel. Allegedly, the defendants had moved "millions of dollars from AFRL . . . into a separate bank account that, by law, was supposed to be used to pay Quantum and other subawardees" and taken the money for themselves and their own businesses. *Id.* at 6–7. In particular, Tolley and Burns purportedly took over $11 million from the AFRL funds: Tolley allegedly received "personal payments" from the funds, and Burns apparently admitted to "us[ing] money intended for Quantum to pay [the] [d]efendants' rent, salaries and insurance, and . . . [for] affiliated businesses." *Id.* at

7 (citing doc. 23-9). All the while, the defendants purportedly encouraged Quantum to join ARCNet and then to work on the Subaward Agreement. *See id.*

Eventually, AFRL prevented the defendants from making "advance draws" of the federal funds, pumping the brakes on the apparent operation. *See id.* SPGI and ARCNet subsequently "issued a suspension of work notice to Quantum in Alabama, . . . and Quantum stopped work." *Id.* Quantum and other sub-awardees "complained about the unpaid invoices" to no avail. *See id.* at 8–9. Quantum claims that at least one of the defendants "communicated with Quantum by telephone and/or by e-mail in Alabama" and "acknowledge[d] that the money was gone." *Id.* at 9. At that point, the defendants purportedly represented that "they would pay all outstanding invoices when they secured funding from an outside investor – essentially promising to replace the misappropriated funds with funds from another source." *Id.* Quantum thereafter filed this lawsuit, pleading claims for (1) breach of contract against SPGI; (2) quantum meruit against SPGI;[2] (3) unjust enrichment against all defendants; (4) fraud and deceit against SPGI, Burns, and Tolley; (5) conversion against all defendants; (6) breach of fiduciary duty against SPGI, Burns, and Tolley; (7) conspiracy against all defendants; and (8) violation of the Alabama

---

[2] The heading for the quantum meruit claim in Quantum's complaint states that Quantum brings the claim against "All Defendants." Doc. 23 at 11. However, Quantum demands judgment on the claim only against SPGI and brings the quantum meruit claim as an alternative to the breach of contract claim against SPGI. *Id.*

Securities Act against SPGI, Burns, and Tolley.  Doc. 23.

### III.

In their motion to dismiss, the defendants contend that the court lacks personal jurisdiction, Quantum agreed to arbitrate its claims, and Quantum fails to allege sufficient facts.  Doc. 29.  The court begins with the threshold questions of jurisdiction and arbitration.  As explained below, although the court has personal jurisdiction over the defendants, the parties must arbitrate these claims. Consequently, the court will not address the Rule 12(b)(6) sufficiency of the factual allegations.

### A.

The defendants claim that Quantum fails to establish personal jurisdiction for three reasons: (1) SPGI's contracts with Quantum and other Alabama corporations cannot establish the "minimum contacts" necessary for specific jurisdiction; (2) SP Global, Tolley, and Burns were not party to any contract with Quantum; and (3) Tolley and Burns "personally had [no] contacts with Alabama outside of their dealings with SPGI."  Doc. 29 at 7.  In short, the defendants assert that "Quantum asserts an insufficient basis for specific personal jurisdiction over . . . SPGI and SP Global, [and] Quantum asserts *no basis* for specific jurisdiction over . . . Tolley and Burns."  *Id.* at 8 (emphasis in original).

1.

A plaintiff can establish a court's personal jurisdiction over a nonresident defendant via general or specific jurisdiction.[3]  *Tinsley*, 112 F. Supp. 3d at 1258 (citing *Int'l Shoe Co.*, 326 U.S. at 316); *see Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000).  General jurisdiction exists where the defendants' connections with the forum state "are so 'continuous and systematic' as to render them essentially at home in the forum State."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (quoting *Int'l Shoe Co.*, 326 U.S. at 317).  Specific jurisdiction, by contrast, "arises out of [the defendants'] activities in the forum that are related to the cause of action alleged in the complaint."  *Consol. Dev. Corp.*, 216 F.3d at 1291.[4]

Two requirements exist for specific jurisdiction.  *Olivier*, 979 F.2d at 830.  First, the defendants must have "engaged in minimum contacts" with the forum state.  *Id.*  Second, "the exercise of personal jurisdiction over the defendants [must not]

---

[3] Because this court sits in diversity, it may exercise personal jurisdiction over the nonresident defendants to the extent permitted under Alabama law and under the Constitution.  *See Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002).  And because Alabama's long-arm statute authorizes personal jurisdiction to the extent permitted by federal due process, *Olivier*, 979 F.2d at 830; *Tinsley v. BP Corp. N. Am., Inc.*, 112 F. Supp. 3d 1253, 1257 (N.D. Ala. 2015), the state- and federal-law inquiries merge.

[4] To the extent that Quantum claims to establish general personal jurisdiction, the court agrees with the defendants that Quantum's allegations do not show that the defendants have "continuous and systematic" contacts with Alabama such that they are "essentially at home" in this forum.  *See* doc. 29 at 6; *Goodyear*, 564 U.S. at 919. The defendants' alleged contacts with Alabama are much more limited.  Thus, the court proceeds to specific jurisdiction.

offend traditional notions of fair play and substantial justice." *Id.* at 830–31 (quotation omitted). Under the first prong, a defendant engages in minimum contacts with the forum state when it "'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Consol. Dev. Corp.*, 216 F.3d at 1291 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). In addition, the plaintiff's claims must "'arise out of or relate to' at least one of the defendant's contacts with the forum." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). If the plaintiff establishes purposeful availment and a relationship between the contacts and the claims, then, to defeat specific jurisdiction, the defendants "must make a 'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Id.*

The analysis of the relationship between the claims and the defendants' contacts "focus[es] on the direct causal relationship between the defendant[s], the forum, and the litigation," as this relationship "is the essential foundation" of personal jurisdiction. *Id.* at 1355–56.[5] "[T]he conduct at issue is that of the

---

[5] Conducting this analysis in *Mosseri*, for example, the Eleventh Circuit determined that a plaintiff's trademark claims arose out of the defendant's contacts with the forum state where the defendant's ties to the state "all involve[d] the advertising, selling, and distributing of alleged counterfeit and infringing . . . goods into the state and accepting payment from [the state's] customers for such goods." 736 F.3d at 1356.

defendants," and "[n]o plaintiff can establish jurisdiction over a defendant through [its] own actions." *First Metro Bank v. Central Bank*, 904 F. Supp. 2d 1215, 1223 (N.D. Ala. 2012) (emphasis omitted). Relatedly, the purposeful availment analysis asks whether the defendants' contacts with the forum state show that the defendants "should reasonably anticipate being haled into court in the forum." *Mosseri*, 736 F.3d at 1357.

2.

Quantum claims that the court has specific jurisdiction over the defendants. Allegedly, the defendants

> purposefully availed themselves of the laws and privileges of the state of Alabama by, among other things, conducting business in Alabama, recruiting business in Alabama, engaging in tortious conduct and causing harm to Quantum in Alabama, marketing and selling securities in Alabama, and participating in a conspiracy to defraud Quantum in Alabama. Defendants knew or should have anticipated that Quantum would feel the effect of their misconduct in Alabama. Furthermore, because Defendants conspired and operated a scheme to defraud citizens of Alabama, they should not be surprised when they are haled into court here to answer for their conduct.

*See* doc. 23 at 2–3. Taking these underlying factual allegations as true, the court agrees that it has personal jurisdiction over the defendants. Far from alleging just one arrangement between Quantum and SPGI, Quantum pleads that all four defendants established or controlled ARCNet and intentionally recruited Quantum and four other Alabama-based companies to join ARCNet under a conspiracy to defraud Quantum and the other businesses. *Id.* at 5. To accomplish this, the

10

defendants purportedly advertised and sold membership interests in ARCNet to Quantum with the expectation that Quantum would seek and perform ARCNet-related federal contracts at its location in Huntsville. *See id.* at 5–7. The defendants also allegedly "used [Quantum's and the other Alabama businesses'] names for promotional efforts."[6]   *Id.* at 5.   And, after SPGI entered into a contract with Quantum, Tolley and Burns allegedly moved funds from the ARCNet account—from which Quantum would be paid—to the SP Global account in order to divert the money to their own companies. *See id.* at 6–8. These claims, if true, establish that Quantum's claims arise from the defendants' contacts with Alabama and that the defendants purposefully availed themselves of the benefits of transacting in Alabama when they actively recruited Quantum and others to join ARCNet.

Accordingly, the burden shifts to the defendants to make a "compelling case" that the exercise of personal jurisdiction contravenes "traditional notions of fair play and substantial justice." *See Mosseri*, 736 F.3d at 1355. As to this prong, the court considers four factors: "(1) the burden on the defendant[s]; (2) [Alabama's] interest in adjudicating the dispute; (3) [Quantum's] interest in obtaining convenient and effective relief; and (4) the judicial system's interest in resolving the dispute." *See*

---

[6] To support this claim, Quantum supplies a screenshot of "promotional materials" that appear to be a list of ARCNet's then-members on its website. *See* doc. 23-4. At least at this juncture, the court is not totally convinced that this list is a "promotional" material that highlights ARCNet's links to Alabama. However, the court understands Quantum to argue that this evinces the defendants' dealings in places that include Alabama and their attempts to show ARCNet's reach.

*id.* at 1358 (quoting *Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008)) (internal quotation marks omitted).  Here, the defendants fall short.

For one, the defendants say nothing about the burdens, if any, they will experience in having to defend against this case in Alabama.  *See generally* docs. 29; 32.  Nor do they argue that Alabama, where Quantum and several of the other allegedly defrauded companies are located, lacks a sufficient interest in adjudicating Quantum's claims.  And indeed, Alabama "has a very strong interest in affording its residents a forum to obtain relief from intentional misconduct of nonresidents causing injury in [Alabama]."  *See Lovelady*, 544 F.3d at 1288.  Quantum, for its part, has an interest in obtaining relief in its home state, and it "is not required to travel to the nonresident[s]' state of residence to obtain a remedy" for misconduct that, allegedly, was expressly directed at it in Alabama.  *See id.*; doc. 23 at 5.  Finally, the judiciary has an interest in resolving this dispute in Alabama, where the defendants purportedly targeted and recruited certain businesses to join ARCNet and where the defendants knew Quantum would perform ARCNet-related work under the Subaward Agreement.  *See Mosseri*, 736 F.3d at 1358; doc. 23 at 5–6.

Collectively, Quantum has met its burden as to personal jurisdiction, and the defendants have failed to show that the exercise of personal jurisdiction offends due process.  Accordingly, the motion to dismiss, doc. 29, is due to be denied as to personal jurisdiction.

12

B.

The court turns now to whether Quantum must arbitrate its claims under the Subaward Agreement. "When, as in this case, a party moves a district court to compel arbitration under the FAA, the court must first determine whether 'the making of the agreement for arbitration or the failure to comply therewith is . . . in issue.'" *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1346 (11th Cir. 2017). Put another way, the court cannot compel Quantum to arbitrate its claims unless Quantum previously agreed to do so, *see Employers Ins. of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th Cir. 2001), and, at this stage, the court must consider "(1) whether there is a valid agreement to arbitrate; and (2) whether the dispute in question falls within the scope of that agreement." *See Scurtu v. Int'l Student Exch.*, 523 F. Supp. 2d 1313, 1318 (S.D. Ala. 2007). To resolve these questions, the court looks to "state-law principles relating to ordinary contract formation and interpretation, construed through the lens of the federal policy favoring arbitration." *See id.* "[D]oubts concerning the *scope* of arbitrable issues should be resolved in favor of arbitration," but this presumption "does not apply to disputes concerning whether an agreement to arbitrate has been made." *Burch*, 861 F.3d at 1346 (emphasis in original).

Here, no one disputes that Quantum entered into the Subaward Agreement containing the arbitration clause, so the relevant questions are (1) who can enforce

the clause and (2) what claims fall under its scope.  The arbitration clause in the

Subaward Agreement provides:

> Any party (*claimant*) who has any dispute relating to this Subaward shall provide written notice to any other person that has an interest in the controversy (*respondents*) describing the general nature of the controversy.  Said notice must designate an Independent Person as an authorized representative who is empowered to fully settle the controversy on behalf of the claimant. . . .  If the authorized representatives do not resolve the controversy within ten (10) calendar days, or unless both parties agree that a resolution is imminent, the ten (10) calendar days may be extended for an additional five (5) working days or additional time as agreed in writing by the parties, otherwise they shall discontinue direct negotiations and submit the controversy to mandatory and binding arbitration.

> If the controversy is not resolved, the parties to the controversy shall submit to mandatory and binding arbitration.  The controversy will be settled by a single Ohio, Montgomery County arbitrator.  Said arbitration will be governed by Ohio Statutes.  In the event both parties are unable to agree on an Ohio, Montgomery County Arbitrator, then the controversy will be settled by arbitration according to the Commercial Arbitration Rules of the American Arbitration Association (AAA). . . .  The arbitrator's decision is final and not subject to judicial review.

Doc. 23-6 at 12.

The defendants argue that the broad wording of this agreement—"any dispute

relating to this Subaward"—cleanly sweeps Quantum's lawsuit within its scope and

mandates that Quantum arbitrate the claims it raises here.  *See* doc. 29 at 14–15.

Additionally, according to the defendants, although SP Global, Tolley, and Burns

are not parties to the Subaward Agreement, they can enforce the arbitration clause

because Quantum relies on the Subaward Agreement to assert claims against them

and because the arbitration clause governs disputes between "any party" and "any other person that has an interest in the controversy." *Id.* at 15 n.14; doc. 32 at 3–4; *see* doc. 29-1 at 12.  For its part, Quantum argues that (1) it has "sued people and entities that are not parties to the purported arbitration agreement," (2) it has asserted claims unrelated to and outside the agreement's scope, and (3) the apparent conflict in the provisions of the Subaward Agreement that refer to arbitration and judicial jurisdiction shows that "the parties did not intend to be bound by the purported arbitration clause."  Doc. 31 at 12–15.

Before delving into these arguments, the court must address a problem about the choice of law to apply in interpreting the Subaward Agreement, including its arbitration clause.  The Subaward Agreement clearly provides that "[it] will be governed by the laws of the State of Ohio," doc. 23-6 at 15, a clause Quantum cites while addressing an argument related to the arbitration clause, *see* doc. 31 at 14.  But neither party asks the court to enforce the choice-of-law provision or, conversely, challenges its enforceability.  Rather, they both argue their motions using Alabama law.  *See* docs. 29; 31; 32.  As a result, the court has opted to cite Alabama law in interpreting the Subaward Agreement while citing corresponding Ohio authorities that suggest the court's conclusions would be the same under either, albeit using

slightly different reasonings.[7]

1.

The first question is whether the defendants who did not enter into the Subaward Agreement—SP Global, Burns, and Tolley—can compel enforcement of the arbitration clause. In some circumstances, nonparties to an arbitration agreement can indeed compel arbitration. *See Ex parte Stamey*, 776 So. 2d 85, 89–90 (Ala. 2000). *See also I Sports v. IMG Worldwide, Inc.*, 813 N.E. 2d 4, 8 (Ohio Ct. App. 2004) (outlining the circumstances under which "[a] nonsignatory may compel arbitration against a party to an arbitration agreement").

First, a nonparty may compel arbitration against a party if the nonparty is an intended third-party beneficiary of the contract. *Ex parte Dyess*, 709 So. 2d 447,

---

[7] The Subaward Agreement also contains a forum-selection clause designating Ohio courts, *see* doc. 23-6 at 16, that the court considers in a later section of this opinion. While the parties likely waived choice-of-law and venue-based challenges by failing to raise them here, the court believes its hybrid method of looking to both sources of law strikes the most cautious approach to the issue. For instance, the Sixth Circuit declined to consider a choice-of-law issue where, although the parties' agreement provided that Ohio law would govern its "interpretation and construction" and although Michigan, the forum state, favored enforcement of choice-of-law provisions, the plaintiff sued under a Michigan statute and "neither party raised the choice of law provision at the district court level." *Hardy v. Reynolds & Reynolds Co.*, 311 F. App'x 759, 761–62 (6th Cir. 2009). In so holding, the Sixth Circuit noted that "the general principles of contract interpretation that would apply in interpreting the [agreement] [did] not significantly differ from Ohio to Michigan." *Id.* at 762–63. And in *Medalie v. FSC Securities Corporation*, the Southern District of Florida applied Florida law to interpret a contract after recognizing that "[b]y arguing their motions based on Florida law, the parties ha[d] stipulated that Florida law applie[d]." 87 F. Supp. 2d 1295, 1297 (S.D. Fla. 2000). To be sure, in *Medalie*, the parties had also contractually consented to venue, personal jurisdiction, and subject matter jurisdiction in Florida. *Id.* But the court also observed that "[b]ecause the parties did not raise a conflict of laws issue in [their] motions and argued their motions based only on Florida law, the law of the forum [would] govern, absent any facts justifying the application of some other state's law." *Id.* at 1297 n.1.

450, 452 (Ala. 1997); *I Sports*, 813 N.E. 2d at 8.  Here, however, SP Global, Tolley, and Burns cannot compel arbitration under a third-party beneficiary theory because they have not established Quantum's and SPGI's intent to bestow a direct benefit on them.  Indeed, the Subaward Agreement expressly provides that "[t]here are no third-party beneficiaries to this Subaward" and explains that "[n]othing in this Subaward, express or implied, confers any legal or equitable right, benefit, or remedy of any nature whatsoever upon any other person or party . . . ."  *See* doc. 23-6 at 16.

In Alabama, an arbitration agreement may also be sufficiently broad to include claims against nonparties.  *See Stamey*, 776 So. 2d at 89–90.  For example, Alabama courts have found that arbitration agreements cover claims against nonparties when the agreement expressly covers "all disputes," the description of the entities subject to arbitration is not restrictive, the claims against the nonparties arise out of the contract or are intertwined with the claims against the party, and the nonparties are closely related to a party.  *See Ex parte Napier*, 723 So. 2d 49, 53–54 (Ala. 1998); *Ex parte Gates*, 675 So. 2d 371, 374–75 (Ala. 1996); *Matthews v. AT&T Operations, Inc.*, 764 F. Supp. 2d 1272, 1283–84 (N.D. Ala. 2011).  Not dissimilarly, Ohio courts also recognize the ability of a nonsignatory to compel arbitration against a signatory under an equitable estoppel theory, which "arises when the signatory to the contract alleges 'substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.'"  *See I Sports*,

17

813 N.E. 2d at 9.

First, the court finds that under Alabama law, the nonsignatory-defendants may compel arbitration against Quantum because the arbitration agreement is sufficiently broad to encompass Quantum's claims against them. *See Napier*, 723 So. 2d at 53–54. The arbitration agreement is not limited to disputes between Quantum and SPGI; instead, it covers "any dispute" between "[a]ny party" and "any other person." Doc. 29-1 at 12. Similarly, the arbitration agreement does not significantly restrict what kinds of claims must be arbitrated; again, the agreement covers "any dispute" related to the Subaward Agreement. *Id.* Also, some of Quantum's claims against SPGI are identical to the claims against the non-signatories, and all of Quantum's claims are intertwined with or relate to the Subaward Agreement.

Also, the court finds that the nonsignatory-defendants can compel arbitration against Quantum under Ohio law. These three defendants have a close relationship with SPGI, the signatory: Tolley is its treasurer, Burns is its president, and both control SP Global, which allegedly received AFRL funds from SPGI. Significantly, Quantum clearly alleges that these defendants worked in concert with SPGI, a signatory-defendant, to defraud Quantum and other businesses through ARCNet, and Quantum asserts a conspiracy on these grounds. Doc. 23 at 2–3. Accordingly, the allegations suggest that Ohio law would allow all of the defendants to enforce

the arbitration provision of the Subaward Agreement against Quantum.

2.

On that note, all of Quantum's claims appear to fall under the arbitration clause's scope, which broadly covers "any dispute relating to" the contract. *See* doc. 29-1 at 12.   In *Green Tree Financial Corporation-Alabama v. Randolph*, the Supreme Court found that an agreement to arbitrate "[a]ll . . . claims . . . relating to [the] [c]ontract" encompassed a Truth in Lending Act claim against creditors who allegedly failed to disclose a charge in a contract to purchase a mobile home. *See* 531 U.S. 79, 83 (2000).  Specifically, the contract provided that "[a]ll disputes, claims, or controversies arising from or relating to this Contract . . . shall be resolved by binding arbitration." *Id.* at 83 n.1.  Relevant here, the TILA claim did not allege nonperformance of a contractual obligation but rather the violation of a statutory duty outside of the contract.   Still, citing the "liberal federal policy favoring arbitration agreements," the Court concluded that a claim that a creditor violated TILA for not disclosing charges in a contract *arises out of* that contract, and so the parties had to arbitrate the TILA claim. *Id.* at 90–91.

Similarly, the Alabama Supreme Court in *Bennett v. Skinner* concluded that an agreement to arbitrate "[a]ny and all claims . . . arising out of or related to the contract" covered claims for fraudulent inducement and the tort of outrage.  98 So. 3d 1140, 1141–45 (Ala. 2012).  The defendant allegedly breached a construction-

19

services contract by shoddily renovating the plaintiffs' house and induced the plaintiffs to enter into the contract by falsely representing to them that he would personally oversee the work with the necessary licenses. *See id.* at 1141–42. The Court determined that the arbitration clause covered the fraudulent inducement and outrage claims because those claims arose out of or related to the original contract. *Id.* at 1143, 1145. In particular, the Court concluded that the outrage claim arose from the defendant's alleged failure to uphold obligations with regard to the contract and out of a "disagreement concerning the construction-services contract." *Id.* at 1145 (internal quotation marks omitted).[8]

Finally, the Ohio Supreme Court in *Academy of Medicine of Cincinnati v. Aetna Health, Inc.* articulated similar standards for evaluating the scope of an arbitration clause. *See* 842 N.E. 2d 488, 492–93 (Ohio 2006). Holding that an arbitration provision that "purport[ed] to cover any disputes about the parties' business relationship . . . [was] a broad clause," the Court instructed that "[a]n arbitration clause that contains the phrase 'any claim or controversy arising out of or

---

[8] Likewise, the agreement to arbitrate "[a]ny controversy or Claim arising out of or related to the Contract" in *Beaver Construction Company v. Lakehouse, L.L.C.* covered tort claims related to the contract. 742 So. 2d 159, 161, 165 (Ala. 1999). The defendant allegedly breached a contract by failing to adequately prepare the construction site, failing to install a sewer system, and withholding sewer tap permits. *Id.* at 163. Among other claims, the plaintiff alleged negligence, fraudulent inducement, and conversion of the sewer tap permits. *See id.* The Court found that all of the tort claims arose out of or were related to the contract because (1) the defendant's allegedly negligent construction was performed pursuant to the contract, (2) the defendant allegedly fraudulently induced the plaintiff to enter into the contract, and (3) the allegedly converted sewer tap permits were issued for the construction project borne from the contract. *Id.* at 165–67.

relating to the agreement' is considered 'the paradigm of a broad clause.'" *Id.* The Court also observed that "[a]rbitration is not limited to claims alleging a breach of contract," meaning a broad arbitration clause can cover alleged violations of statutory rights so long as "the parties agreed to arbitrate the issue." *See id.* at 493. Following these principles, the Court of Appeals of Ohio in *Sebold v. Latina Design Build Group, L.L.C.* addressed an arbitration clause that covered "any 'disagreements arising out of contract or breach thereof.'" 166 N.E. 3d 688, 692 (Ohio Ct. App. 2021). There, the court held that the plaintiffs' claims for violations of the Ohio Home Construction Services Supplier Act and the Ohio Consumer Sales Practices Act, breach of contract, and breach of implied duty to perform in a workmanlike manner, among other claims, "[were] all disputes that emanate[d] from the parties' contractual relationship" and thus "[fell] squarely under the arbitration provision." *Id.* at 691, 693.[9]

This case law demands a broad interpretation of the phrase "any dispute relating to this Subaward," and Quantum's claims fall within the scope of claims broadly related to the Subaward Agreement. *See* doc. 23-6 at 12. The unjust enrichment claim alleges that the defendants unjustly received funds from AFRL because of Quantum's work performed under the Subaward Agreement. Doc. 23 at

---

[9] Moreover, the court recognized that "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Sebold*, 166 N.E. 3d at 692.

12.  The fraud and deceit claim alleges that SPGI, Burns, and Tolley fraudulently concealed that they had no intention to pay Quantum and falsely promised contract opportunities to induce Quantum to enter the Subaward Agreement.  *Id.* at 13–14. The conversion claim alleges that the defendants rerouted funds that Quantum earned for work performed under the Subaward Agreement.  *Id.* at 15–16.  The breach of fiduciary duty claim alleges a relationship of trust established by Quantum's reasonable belief that SPGI, Burns, and Tolley would pay Quantum for work performed under the Subaward Agreement.  *Id.* at 17.  The conspiracy claim rests on all of these allegations.  *See id.* at 18.  And the Alabama Securities Act claim alleges that the ARCNet membership is a security under Alabama law that SPGI, Burns, and Tolley sold to Quantum so they could reap funds from AFRL intended for Quantum under the Subaward Agreement.  *Id.* at 20–21.

In short, without the Subaward Agreement, there are no claims.[10]  And the federal and state policies favoring arbitration bolsters this conclusion.  Accordingly, all of Quantum's claims fall within the broad arbitration clause of the Subaward Agreement.

---

[10] The conclusion is the same even if Quantum is asserting that the defendants withheld a separate benefit owed to Quantum because of its membership in ARCNet, and not specifically because of the Subaward Agreement.  ARCNet would apparently "solicit opportunities" for its members. Doc. 23 at 5.  Those opportunities were projects under the Cooperative Agreement.  *See id.* at 4–6.  Quantum seized one such opportunity and consequently entered into the Subaward Agreement. In other words, the Subaward Agreement was Quantum's benefit from joining ARCNet. Therefore, none of the claims can ignore the Subaward Agreement and rest only on Quantum's membership in ARCNet.

3.

Quantum's final argument that contradictory language in the Subaward Agreement obscures the parties' intent is also unavailing. *See* doc. 31 at 14. The allegedly contradictory terms are the arbitration provision and the forum-selection clause in the Subaward Agreement. *See id.* The forum-selection clause is contained within the provision that reads:

> This Subaward will be governed by the laws of the State of Ohio. The Parties agree that jurisdiction and venue for any dispute arising under (or as a result of) this Subaward will be tried in appropriate federal or state courts encompassing Montgomery County, Ohio, and each Party submits to the jurisdiction of such courts.

Doc. 29-1 at 16.[11]  To be sure, when read in conjunction with the arbitration clause, this provision may appear to establish incompatible agreements to arbitrate and to litigate.  However, the clauses can be reconciled.

Under Alabama law and Ohio law, courts must attempt to reconcile inconsistent contract terms, give effect to each term, and construe the terms in

---

[11] Again, neither party has asked the court to enforce this provision. *See* docs. 29; 31; 32. *See also* doc. 31 at 14 n.9. Presumably, Quantum believes its claims fall outside the scope of this provision, *see* doc. 31 at 14 n.9, and the defendants ultimately want Quantum to arbitrate its claims outside of any judicial forum, be it an Ohio court or an Alabama court, *see* doc. 32 at 3–4. (Quantum also suggests that applying Ohio law would not alter the relevant components of the court's analysis, anyway. *See* doc. 31 at 13.) While this court believes that Quantum's claims likely fall within the scope of the forum-selection clause for the same reasons they fall under the arbitration clause, *see supra*, because the parties do not contest venue and in light of the federal policy favoring valid arbitration agreements, the court will dismiss the case on arbitration, not venue, grounds.  And again, because the Subaward Agreement states that Ohio law will govern, in an abundance of caution, the court cites to Alabama law and Ohio law in its interpretation of the Subaward Agreement.  The court also observes that these laws appear to align in this context.

relation to the contract as a whole. *Bay Shore Power Co. v. Oxbow Energy Sols., LLC*, 969 F.3d 660, 666 (6th Cir. 2020); *Advance Tank & Constr. Co. v. Gulf Coast Asphalt Co.*, 968 So. 2d 520, 527 (Ala. 2006). And generally speaking, courts have reconciled apparently contradictory arbitration and forum-selection clauses by finding that the parties intended to arbitrate claims within the scope of the arbitration clause, litigate nonarbitrable claims, and choose the governing law and forum for that litigation. *See, e.g.*, *Applied Energetics, Inc. v. NewOak Cap. Markets, LLC*, 645 F.3d 522, 525 (2d Cir. 2011); *Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*, 297 F.3d 388, 395–96 (5th Cir. 2002); *Advance Tank*, 968 So. 2d at 527; *Cook v. Cmty. Health Partners*, No. 13CA010520, 2015 WL 1291514, at *3–4 (Ohio Ct. App. March 23, 2015); *Sims v. Clarendon Nat. Ins. Co.*, 336 F. Supp. 2d 1311, 1319 n.3 (S.D. Fla. 2004).

Here, the parties agreed to submit "any dispute relating to [t]he Subaward" to "mandatory and binding arbitration," doc. 29-1 at 12, but also agreed "that jurisdiction and venue for any dispute arising under (or as a result of) this Subaward [would] be tried in appropriate federal or state courts encompassing Montgomery County, Ohio" applying Ohio law, *id.* at 16. Under a plain reading of the provisions, the parties agreed to litigate only the issues of jurisdiction and venue in Ohio court and to leave all other issues to arbitration. And although they also preselected this jurisdiction and venue, the forum-selection clause would place any disputes about

24

jurisdiction and venue—*e.g.*, challenges to enforceability—in the hands of the Ohio court. Then, the arbitration clause would require arbitration of all other issues. Because the clauses can be reconciled,[12] the court sees no basis for setting aside the arbitration provision, and Quantum must submit to arbitration on its claims.

## IV.

In sum, the court will grant the motion to dismiss, doc. 29, because the defendants can validly enforce the mandatory arbitration clause against Quantum on its claims under the Subaward Agreement. As a result, the court need not wade into the sufficiency of Quantum's factual allegations or the Rule 12(b)(6) aspect of the motion to dismiss. A separate order follows.

**DONE** the 28th day of June, 2022.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

---

[12] A broader interpretation of the forum-selection clause would provide Ohio courts jurisdiction over all disputes, without limitation. Quantum seems to endorse this interpretation by selectively omitting the crucial language "jurisdiction and venue" and "will be tried" from the forum-selection clause. *See* doc. 31 at 14–15. Perhaps Quantum is correct that the parties essentially meant to say that jurisdiction and venue for any dispute arising under the Subaward Agreement *are* the federal and state courts encompassing Montgomery County, Ohio. *See id.*; doc. 26-3 at 16. Even if so, however, the forum-selection and arbitration clauses can still be reconciled. Quantum and SPGI would have agreed to arbitrate all claims within the scope of the arbitration clause and to litigate in that particular forum issues outside the scope of the clause or arising out of the arbitration. This reconciliation suggests that the parties did intend to be bound by arbitration for the claims at issue.